Good morning, Your Honor, and may it please the Court. I'm Elizabeth Newman representing Mr. Aguilar. And in this case, Your Honor, the district court did two things. It sentenced based on facts that it made up, and it sentenced based on an improper factor. The facts that it made up were facts that, or were derogatory stereotypes that didn't have any basis in any sort of individualized determination about Mr. Aguilar, specifically or personally. The Court said a lot of these children, there isn't much involvement, meaning much parental involvement. So the Court was putting Mr. Aguilar... What showing did Mr. Aguilar make that there was family involvement on his part? Well, Your Honor, the... What are the facts in the record? The facts in the record were that Mr. Aguilar, well, basically, Your Honor, let me back up for half a second and say... Well, no, you just made a statement. Yes. Let me back it up now. Right. Show me what facts are in the record that support what you just said. It's a cultural assimilation argument, Your Honor, and the record about Mr. Aguilar's cultural assimilation... Well, what are the facts that show that Mr. Aguilar was involved with his children? The facts show that the children were born, that he was married to the mother of one of them, that he... that there was nothing really else in the record to show that he was not involved. But, Your Honor, that doesn't mean that this was not an issue. I mean, in any sort of procedural error case, the court is going to face, you know, a question of... I mean, the court doesn't then say, well, the sentence was substantively reasonable anyway, so it doesn't matter. I mean, this was a... Here is the court saying that he's classing Mr. Aguilar in a group of cases saying these cases, meaning, I don't know, defendants, illegal reentry defendants, Mexican people, I don't know. And the record doesn't show. But none of those alternatives is a good one. But, you know, the court had an obligation to sentence Mr. Aguilar based on actual facts. Did the district court actually make a finding of that? Or was he just sort of, you know, responding to arguments that counsel was making? Counsel was making an argument, Your Honor. The argument counsel was making was, he's not as bad a guy as you think he is, Your Honor. He came back to this country because there are some things pulling him here that are not criminal things and that are not aggravating things. For example, he has kids in this country. What did the pre-sentence report say about his contact with his children? The pre-sentence report didn't say a lot, Your Honor. It said that how old the children were, which shows that both children were born before Mr. Aguilar was ever deported. And it said that as to contact, it said that as to his son, who was 19 at the time the report was prepared, that he hadn't had contact with this boy or this young man in the two years that he'd been incarcerated stateside and in this case. And it didn't say anything else about this young man, except that — was that me? I don't think — I don't know. Sorry. Except that — I hope it's not a comment on the argument. Except that the young man lived at a distance that wasn't particularly far from the areas where Mr. Aguilar had lived. As to the daughter, who was 14 at the time the report was prepared, and this is all in paragraphs 69 to 71, Your Honor, of the pre-sentence report, the report said that she lived with her mother, and it didn't say anything else except that it said where she lived more or less, San Bernardino, I believe, and that that was also — or Whittier — and that that was also an area where Mr. Aguilar or near to where Mr. Aguilar had always lived. And it didn't say anything else. But it certainly didn't say that he didn't have contact. It didn't say he was an uninvolved father. And if you reason based on what it did say, it implies that before he had — before he was in custody on this offense and for the parole revocation in the state, that he did have contact with his son. Because otherwise, why would he say, I haven't had contact in the last two years? Why would it say anything like that? But that's all the record says. And it's sketchy, Your Honor. I mean, there's no denying that. But it doesn't say that he's one of these people as to whom there's no parental involvement. In the other — I'm sorry, Your Honor? Roberts. No. Go ahead. I want you to address the other issue. Right. The other issue is, of course, that the district court said essentially that Mr. Aguilar had had no right to have children at all because he didn't have legal status in this country. No, that's not part of the issue. We'd like to hear the reporting conditions argument of supervised release. All right, Your Honor. I mean, we did acknowledge in the reply brief that the court has already decided that issue in Rodriguez-Rodriguez. Well, we decided a slightly different issue in Rodriguez-Rodriguez. We decided that the requirement that you report to the parole officer for instructions within 72 hours of release from custody or reentry is not a Fifth Amendment violation, that there's another case, U.S. v. Satcho, that says that a condition requiring that you promptly and truthfully answer all inquiries violates the Fifth Amendment. Right. And I understood that was your argument with respect to the second report. It is, Your Honor. And I mean, to be — I mean, I think in frankness to the Court, that was the argument in Rodriguez-Rodriguez as well. I'm the author of all of that briefing. And that was the argument presented to the Court in Rodriguez-Rodriguez. So how do you understand Rodriguez? What's your understanding of Rodriguez-Rodriguez? I understand that it's mistaken, Your Honor, precisely because of the Court's decision in Satcho and precisely because the Court in Rodriguez-Rodriguez overlooked the standard. So maybe I didn't ask my question. Maybe I wasn't clear. I'm sorry. What do you think is the holding of Rodriguez-Rodriguez? That the condition — that this condition that requires him to report within 72 hours of return does not violate his Fifth Amendment rights. Okay. All right. How does that apply to the condition that — the other condition that's challenged here, which was he's to answer all questions truthfully. I believe the general order says the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer. Right. So how does the holding in Rodriguez-Rodriguez apply to this particular provision? Well, I would say that this particular provision is governed by Satcho, which in turn, you know, is implicated by Murphy and Cologne and all of the other, you know, Supreme Court authority that we cited. But I would point out — I mean, I think I'm obliged to point out that the Court's decision in Rodriguez-Rodriguez postdates Satcho. And — How about — what is that, Bucci? Bucci. Yeah. Bucci, I think, presented the exact same issue. I believe — I haven't actually seen the briefing in the case, but I believe it presented the precise — Well, Bucci just said that the issue was premature until he's confronted with the question. Right. Well, I would disagree with that completely, Your Honor. Right. I mean, because this Court's case law says pretty clearly that a supervised release — the condition of supervised release is ripe and litigable at the moment that it's imposed and at the moment that it's approved. But how do you square that with a general notion when it comes to the Fifth Amendment that, you know, you can't — when we think about the Fifth Amendment, the assertion of a Fifth Amendment privilege against self-incrimination is you can't make a blanket assertion. That is to say, the probation officer could ask this — any probationer, and this rule applies across the board, irrespective of particular — the category of crime. Yes. It applies across the board. Yes. You know, it's — probation officer could ask any number of questions and wouldn't be incriminating. No, certainly not. So why — so why can we say it's, you know, like in Bucci terms, why is it really ripe until we really know what the questions are? Because he doesn't — the probation officer doesn't really have to ask any question at all. The — you know, the truth of the matter is that it's virtually inconceivable that someone like Mr. Aguilar could ever reenter this country legally. And so the very action of — Well, is that necessarily true? Because of the case law, the statutes, and the regulations that govern when somebody convicted of a crime — Doesn't the deportation order say that he can't reenter without permission of the attorney general? It does, Your Honor. But the statutes and regulations that govern when the attorney general grants that permission are pretty — are quite clear about that there are extremely limited exceptions to basically what is a blanket bar in a case like this. And I'd be happy to provide the Court with additional briefing on that. But at that point, your argument is with Rodriguez-Rodriguez. I'm sorry, Your Honor? But on that point, your argument is with our holding in Rodriguez-Rodriguez. Yes. And we're bound by that. Yes. Yes. Right. Right. The case that — I mean, the case that is — And Judge Pines' question was a slightly different one. Yes. It's not as to whether or not he's required to report — can legitimately be required to report to the probation officer, but rather can he legitimately be required to answer all questions. That's a somewhat different question. And my difficulty is the Abucci question. It seems to me that Satcho says he's not required to answer any question whatsoever if it's incriminating, which means that he can't be required to answer all questions, depends on what they are. But Abucci says, well, we can't get to that question — that issue until we see the questions. And this is plain error, correct? This argument was not raised. Right. This was not raised below at all. Okay. Right. But that — I mean, that is the question. But I think the point is that it almost doesn't matter what questions he's asked because his act of appearing is an admission that he's here and that he must process it. That's back to Rodriguez. Right. It's a whole different inquiry. I wanted to — you know, the whole question about identity, you know, questions to an illegal alien who's here and just asking who he is. Yes. Identity. Yes. I had a big battle over that issue, and I lost it. So I gave up on that point. But let me ask you, why can't you just read this general order rule, you know, the general order to not preclude an assertion of the Fifth in front of the probation officer? I think that the point is that in order to assert the Fifth Amendment, the client or Mr. Aguilar in this case would have to be educated, you know, to assert the Fifth. And it's — you know, it's a little bit frustrating and, you know, leads him already to be punished with a revocation. The problem I have is, you know, we're not dealing with just illegal reentry cases. Yes. We're dealing with cases across the board. Yes. Yes. I recognize that, Your Honor. And I don't have a problem if the court, you know, wants to remand with an order rewriting the condition to say that he's immunized from further illegal reentry prosecutions arising from his reporting to a probation officer. I mean, I think what the — Well, it's not quite what I had in mind. Of course, you wouldn't have a problem with that. So if there are no more questions, you are over your time. Yes. Thank you, Your Honor. Thank you very much. May it please the Court. I'm Ethel Othell on behalf of the United States. Your Honors, on the reasonableness question, on the procedural reasonableness of the sentence, Judge Matz made clear, I think, that he was sentencing the defendant based on the defendant's conduct in returning to the country repeatedly and his criminal history. The way the challenged portion of Judge Matz's statements come up is in response to what opposing counsels referred to as a cultural assimilation argument, an argument that defendant's conduct in returning to the country should be mitigated because of his connections here. And in that regard, with regard to the defendant's children, all that was raised in the sentencing papers was the fact that he has children in the country, not anything about his relationship with them. And that's the same with the hearing. There was an allusion to the fact that he has children. And I think that's what Judge Matz was responding to in his statement in response. He was saying at that level that that's not good enough. And I think that if there were a more developed argument by the defendant about reasons why he returned to the country, for example, if his children were sick and he has a relationship with them, if there's a wedding, a graduation, arguments that defendants do make, then perhaps Judge Matz's response might be inadequate to respond to what the defendant has raised, but tied to what the defendant has raised and the fact that there's then an allocution from the defendant, the defendant doesn't say anything about his children are returning to the country because of his children. I just sort of place this argument in, you know, it's an unfortunate comment by Judge Matz, and that's the only basis for this argument. Yes. I believe that it's simply loose language. But I think the overall point of what Judge Matz was saying is clear. And as Judge Paz was indicating, at least through a question to opposing counsel, I mean, my view is that this wasn't a factual finding by Judge Matz in any way that was raising the defendant's sentence based on the number of children the defendant has or the relationship or lack thereof. But I think Judge Matz was saying, you know, all you've told me is that he's had children here and that's not good enough. And that that point comes across, and there's no reason to think that is something that the sentence would have been changed had Judge Matz, you know, been slightly corrected in the exact number of children and that sort of thing. It's clear that Judge Matz read the pre-sentence report carefully. There was a discussion at the very beginning of the proceedings where Judge Matz catches what he believes is a typo. It turns out it wasn't a typo, and who the defendant was married to and when. And as far as the way Judge Matz treats the defendant, there's colloquies at the end of the sentencing proceeding where Judge Matz, the defendant's allocuting Judge Matz, asks several questions of the defendant to understand better how he is allocuting and what he means. At the very end of the proceedings, the defendant states that he wishes to go to a maximum security prison, a maximum security prison. And Judge Matz talks him out of that and says that that's not, that's not the just thing to do for him. So this is a proceeding where Judge Matz has engaged the defendant and treated him humanely and not one where this, you know, isolated sentence or two that the defense counsel is referring to somehow turns the explanation for the sentence into something that's procedurally unreasonable. Those are my comments about that. The Rodriguez-Rodriguez argument that the Court raised, because the defendant in the reply brief conceded that it's bound, that this case is bound by Rodriguez-Rodriguez, in fact, that's what. Suppose we don't agree with the defendant's position that this case is exactly covered by Rodriguez-Rodriguez. Well, I do think that because it's reviewed for plein air and because there's that concession that this is probably not the appropriate case to reach a further nuanced point in that area. But it is our position that if there is something, if there is some room there, something to be challenged about the requirement that the defendant report truth or answer questions truthfully to the probation officer, that the time to raise that is in the context of such a question actually being asked and the defendant refusing to respond. I'm a little bit concerned about the apparent conflict in our case law between Satcho and Arbaci. Abuchi. Abuchi. Can you distinguish those cases for me? I frankly aren't because of the way that it's been raised here. I have not. I have read those cases in the past. I haven't reread them real recently. I admit because I thought that that issue was conceded here. And so I had thought, based on my reading in the past, that Rodriguez-Rodriguez sort of settled this area at least to a challenge that's raised now, you know, at the time that the conditions are imposed. Let me ask you this. I'm just reading the conditions. It's boilerplate. I'm just reading condition number four, standard conditions of probation and supervised release. The defendant shall answer truthfully all inquiries by the probation officer. That's unconstitutional. You cannot require him under Satcho to answer all inquiries truthfully. Can you? Not if it's going to incriminate him. That's what I said. You cannot require him to answer all inquiries. There are some inquiries that he is not required to answer. I believe that if it's going to incriminate him, then, yes, that is the case. Well, why in the world do you keep this standard boilerplate after we have decided Satcho? Well, I mean, you could also ask the question, why is this not challenged? No, I'm asking you a different question. Why are you keeping this as your boilerplate after our decision in Satcho? Because I believe that the probation officer's answer and our answer in defending the condition is that the way to raise such a challenge would be when the question is asked. I'm not asking you about when to raise the challenge. I'm asking you a different question. This seems to me clearly unconstitutional in that it says you have to answer all questions, and you've just conceded, as I think quite properly, you must. He doesn't have to answer all questions. So why do you say he has to answer all questions? To track Satcho, we could, the condition could be changed to have an additional clause at the end of the decision. I don't see why it just could. Why don't you? I believe that because that would just reflect the law, that is, that would be proper to change that, and we would not oppose that. Do you undertake here now that you will change it? I don't want to agree to specific language because we'd have to work that out with the probation officer. The district court's general order. That is true. It comes from the district court. The district court has a general order that mandates all the district court judges to include these particular terms and conditions in a order of supervised release. For a very long time. Right. Two-thirds of the court knows that, I mean, this condition has been imposed. Right. It was there when I was here. I imposed this condition numerous times. Yeah. Because it's, I always would say, and all conditions, supervised release imposed by general order, whatever it is, then the defendant shall comply with it. Right. For any general condition, of course, there would be a limit implicit that it can't be imposed in an unconstitutional way. I asked the defense counsel, why can't you just read this? That's what we would. Except it shall not preclude the defendant from asserting his Fifth Amendment right. The Fifth Amendment privilege is self-incrimination. We would read that that way. And that is the way that I think it has been read. And if you asked anyone, you know, on the district court or practicing before the district court. I seriously question whether any district court judge, if they were, I guess this whole idea stems from the notion that it would be a penalty. That is, if he refused to answer these questions, his supervised release could be revoked and he could be penalized for that. You know, I seriously question in my own mind whether any district court judge on a referral from a probation officer that the defendant asserted his Fifth Amendment right, that the district court judge would revoke or somehow or other impose a penalty for that. Yes. I think that may be why this issue, you know, in all the years that the Senate of California has been applying this condition, that that concern has not really been raised because defense, you know, defendants are not in fact penalized in this circumstance. Well, but they might be penalized if the – imagine that I've got – we've got somebody who's subject to this condition. His probation officer asks him a question which is incriminating, to which the answer is incriminating. He understands that he's required to answer everything truthfully, and he answers. Now, he has the legal right, as we've just understood here among us, he has the legal right to say, no, I won't. Right. But he reads this and says, I've got to answer it. So he does, and he's incriminated. Now what? I understand that one could argue that it would be better for notice to the defendant to tell the defendant he's sentenced now. It would be nice to tell him what his legal rights are instead of telling him that he has to do something that he's not required to do. Sure. But I don't believe, Your Honor, that that's required because in all sorts of contexts, you know, citizens are presumed to be able to know the law. They can seek advice from their counsel at the time of sentencing, and, you know, we don't, if a defendant is being questioned by the officers in other contexts, we don't. Well, by definition here, we're talking about a noncitizen who may not have counsel. Anyway, your time's up. I think we're going to have to thrash this out among ourselves. Thank you, Your Honor. Thank you very much. The case of U.S. v. Aguilar will be submitted.
judges: Wardlaw, Fletcher, Paez